*755 OPIHIOW.
Aeundell:
At the outset our jurisdiction to determine the tax computed for the period January 1, 1921, to June 30, 1921, and for the fiscal year ended June 30,1922, is challenged by respondent. His contention is based on the ground that no deficiencies were determined for those periods and that the overassessments determined by him did not result from the rejection in part of claims in abatement. The controversy on this point grows out of the change in the manner of reporting petitioner’s income, the details of which are set forth at length in the findings of fact. Petitioner, in the first instance, reported his income for the years 1921 and 1922 on a calendar year basis and the tax shown on the returns was duly assessed. Thereafter, on respondent’s demand, other returns were filed in which the income for the period from January 1 to June 30, 1921, and for the fiscal year ended June 30, 1922, was reported. These latter returns disclosed taxes in the respective amounts of $51,524.37 and $2,959.38, which amounts were assessed. As a result of his audit of the returns for those periods respondent determined taxes in the respective amounts of $100,412.14 and $6,943.25. The respondent added together the amounts assessed as originally returned on a calendar year basis and the amounts assessed on the returns filed on a fiscal year basis, and as the aggregate was more than what he has determined as the tax liability for the fiscal periods in dispute, it is claimed that there is no deficiency within the meaning of section 273 of the Revenue Acts of 1924 and 1926. But the admissions contained in the two sets of returns were not cumulative, but overlapping. As petitioner aptly states, two admissions that he owes the same amount does not make him owe twice that much. We have no hesitancy in finding that the Commissioner has determined a deficiency within the meaning of the statute and that the Board has jurisdiction of the proceedings. Respondent’s motion to dismiss for want of jurisdiction is denied.
As to the question whether returns beginning in 1921 should be on a calendar or fiscal year basis, all that we have before us is that petitioner asked permission to change from calendar to fiscal year and that such permission was granted. We do not know as a fact how petitioner’s accounts were kept either before or after 1921. We must assume, however, that the petitioner satisfied the respondent *756 that his accounts were kept on a fiscal year basis and that being so kept they correctly reflected income.
The issue that pervades all the years is whether the amounts that petitioner received and then paid to his mother should be included in his income. The amounts so paid were half of petitioner’s salary and share of the profits from the partnership of Cohan and Harris and the same proportion of profits derived from petitioner’s individual operations after the dissolution of Cohan and Harris.
The petitioner contends that he properly excluded from his taxable income all sums paid to his mother and advances several theories in support of his claim. He says that he and his mother were partners or joint adventurers; that his mother was either a sub-partner of the firm of Cohan and Harris, or that Sam H. Harris was a sub-partner of the partnership relationship existing between himself and his mother; and that his mother had a proprietary interest in the business of the firm of Cohan and Harris, and in all theatrical attractions produced and theaters operated by petitioner independently of the firm of Cohan and Harris, and that she therefore had a proprietary interest in the net profits of the firm and of petitioner’s independent operations.
What are the underlying facts? The Cohan family, father, mother, son and daughter had operated together in the early days. Following her marriage in 1904, the daughter withdrew from the arrangement. George continued his association, but the family arrangements were different and changing. It was during this period that petitioner was winning his way to the front ranks of his profession. His parents were growing older. It was on his father’s sixty-sixth birthday that petitioner wrote the letter we have quoted in full in the findings of fact, which letter is now, offered as constituting the basis for a legal relationship. It is that period after his father’s death, however, with which we are here concerned. Petitioner had assured his mother that everything would go on as it had theretofore and that he wanted her to take an interest in his business affairs. True to his word, he thereafter paid over to her one-half of his income from the partnership with Harris and after the dissolution of that partnership he paid to her one-half of his income from enterprises conducted by him individually.
It is this arrangement between petitioner and his mother that we are asked to characterize as a legal partnership or as giving the mother a proprietary interest recognizable in law in petitioner’s business. Where in this state of facts can a partnership or joint venture be found ? As far as we can find from the record the mother contributed nothing in the way of services or property. She had nothing invested that would entitle her to any part of the proceeds *757 of any of the enterprises in which petitioner was engaged. The fact that Harris may have known of the arrangement between petitioner and his mother did not make the latter a partner, and such portion of the proceeds as she- received came to her not from the partnership but from the petitioner. Rockafellow v. Miller, 107 N. Y. 507; 14 N. E. 433; Burnett v. Snyder, 76 N. Y. 344.
While the courts have been for the most part reluctant to lay down a comprehensive definition of a partnership, there can be no doubt that one.of the essentials is the contribution by each of the pretended partners of either property or services to the enterprise. See Meehan v. Valentine, 145 U. S. 611; Ward v. Thompson, 22 How. 330; Evans v. Warner, 47 N. Y. S. 16.
. .The petitioner says that this branch of the case falls within the cases of M. L. Virden, 6 B. T. A. 1123; L. F. Sunlin, 6 B. T. A. 1232; William W. Parshall, 7 B. T. A. 318; and C. R. Thomas, 8 B. T. A. 118. In the Virden case the petitioner and his wife had joined together to carry on a trade or business, “ one contributing property and the other property and services,” and “ they had a community of interest in the profits.” In the Sunlin case each of the partners contributed property and services. The partners were thereafter married. We held that:
After marriage of the partners what had theretofore been a business partnership became a joint venture. The interest of the petitioner and his wife in the 'property and business and their respective rights to the income therefrom remained unchanged * * *. (Italics added.)
In the case of Parshall the wife of the petitioner acquired the latter’s interest in a partnership in settlement of a debt owing to her by the petitioner. In the Thomas case one of the partners sold to his daughter a one-half interest in his interest in the partnership. In each of these cases it is apparent that the party with whom the income was divided had acquired by purchase or contribution some interest in capital assets which is sufficient to distinguish them from the present case.
Our view is that the question is controlled by the decisions in Ormsby McKnight Mitchel, 1 B. T. A. 143; Mitchel v. Bowers, 9 Fed. (2d) 414, affd. 15 Fed. (2d) 287, where Mitchel, a partner in a firm, contracted with his wife to transfer and assign to her one-half of his share of the profits of the partnership without attempting to convey to the wife any part of his interest in the partnership. The Board held that Mitchel’s entire distributive share of the nee income of the partnership should be included in the computation of his net income, and saying in part:
Clearly, under tlie statute, the income derived by the partnership must be returned for taxation as the income of the respective partners in accordance with their distributive shares and can not be diverted to become the income *758 of someone else by agreement or otherwise. * * * As between the parties to this agreement it may be legal and enforceable and the taxpayer may be a trustee of one-half the income he receives -from the partnership of which he is a member and compellable to account therefor, but this is of no materiality in considering the question before us. The income from taxpayer’s interest in the partnership is first income to him, and no matter how he tries to dispose of it or does dispose of it, it is taxable to him as income from his interest therein. It does not alter the situation to say that as soon as income arises in the partnership at that instant it becomes the property of the grantee, as this is mere assertion. The fact is that before it becomes the property of the grantee it is income, within the meaning of the law, to the grantor, and the statute recognizes this fact when it requires the income of the partnership to be included as the income of the partners in their individual returns according to their respective shares therein.
In the decision in the same case in the Circuit Court of Appeals, 15 Fed. (2d) 287, the court said in part:
As a subpartner the wife through the agreement got no present interest, equitable or legal, in the firm assets; the assent of the other partners would have been as necessary for this as to constitute her a partner, for ownership follows the status. Until by distribution the profits became the separate property of the plaintiff, her rights were upon the contract, not in re. * * * Therefore the plaintiff was in any event obliged to include all undistributed profits in his return; the statute so directed, and the profits pro tanto were still his. (Italics supplied.)
In the Mitchel case the agreement was founded upon valuable consideration and here we have no showing of such consideration. The amounts which petitioner paid to his mother, as far as the record shows, were purely gifts, and such gifts were made out of income after it had become petitioner’s. It is our opinion that the petitioner was not entitled to exclude from income the amounts paid to his mother and we hold that the respondent did not err in adding such amounts to petitioner’s income.
Issues 3 and 4 may be disposed of together, both involving the question whether petitioner had made such assignment or gift of royalty rights as would relieve him of tax on the royalties. In 1918 the play “Get Rich Quick Wallingford ” produced royalties in the amount of $675, which amount was paid to petitioner’s mother as a continuation of the prior practice of paying them to petitioner’s father under a promise made in 1910 that if the play were produced the father should have the royalties.
The royalties from the songs in “ The Royal Vagabond ” were paid to petitioner’s wife under an oral promise that petitioner would give them to her. They amounted to $14,816.85 in 1919 and $5,488.82 in 1920.
We do not know just how the “ Wallingford ” royalties reached the mother. The royalty checks from “ The Royal Vagabond ” songs *759 were issued to petitioner and by his attorney endorsed and passed on to petitioner’s wife.
The evidence does not indicate to us that the petitioner had divested himself of the right to receive the royalties. Even if the assignees could have enforced petitioner’s promise against him, that would not prevent the royalties from first being income to him. See Bing v. Bowers, 22 Fed. (2d) 450; Samuel v. Woods, 5 B. T. A. 413; Fred W. Warner, 5 B. T. A. 963. It may be that the petitioner at the time of making the promises intended to make gifts of the right to receive royalties, but if so, he failed to complete the gift for, as far as the record shows, he did not divest himself of control over the rights. See S. L. Fowler, 6 B. T. A. 250, and cases there cited, and Gannon v. McGuire, 160 N. Y. 476; 55 N. E. 7. We can not find that the respondent erred in including in petitioner’s income for 1918 the royalties from “ Get Rich Quick Wallingford,” and for 1919 and 1920 the royalties from songs in “ The Royal Vagabon.d.”
Under issue 5 the petitioner claims a deduction from 1919 income, as a loss, of the amount paid in 1918 on annuity contracts which he forfeited in 1919, by failure to pay the premiums which became due in the latter year. He contends that the contracts were not contracts of insurance of any kind, and is not deducting the premiums as such, but that the forfeiture resulted in the loss of his capital investment, and that this loss results from a transaction entered into for profit.
The respondent disallowed the deduction claimed and says that there is nothing to distinguish the contracts from “ ordinary annuity insurance contracts ”; that the petitioner did not enter into the contracts for profit, and that the amount paid in 1918 was a personal expense of petitioner.
The respondent’s descriptive phrase is an incongruity, insurance contracts and annuity contracts being entirely distinct and separate things. A contract for an annuity is not a contract for insurance and the price paid for annuities is not a premium paid for an insurance policy. People v. Knapp, 184 N. Y. S. 345; affirmed, 132 N. E. 916; Commonwealth v. Metropolitan Life Insurance Co., 254 Pa. 510; 98 Atl. 1072. However, we need not go into this feature as the petitioner is making no claim for the amount paid as an expense. A transaction does not fail to meet the test as one entered into for profit because the receipts therefrom may take the form of periodic returns to the investor. Convinced that the investment was not a wise one he refused to have more to do with it and in 1919, forfeited not only the amount theretofore paid in but all. future rights under the contracts. The amount paid at the time of the forfeiture is an allowable deduction under section 214 (a) (5) of the Revenue Act of 1918.
*760 As to issue 6 we think there can be no doubt that the $10,000 paid by the firm of Cohan and Harris into the so-called strike fund of the Producing Managers’ Association was a necessary expense of the business. It is common knowledge that strikes seriously affect business enterprises and money expended to avert some of the consequences certainly has a direct relation to the business. The amount of $10,000 should be allowed to the partnership as a deduction and the petitioner’s distributive share of the partnership income adjusted accordingly. Cf. Independent Brewing Co., 4 B. T. A. 870.
The amount of $150,000 which was advanced by petitioner to his partner in 1920 is claimed to be an ordinary and necessary expense incurred in the acquisition of preferential booking privileges at the Grand Opera House in Chicago. The record does not support this claim. The contract of November 22, 1920, refers to the amount as a loan which was to be repaid without interest. The.petitioner testified that it was understood between him and Harris that there was no personal obligation to repay, but that it was to come out of the profits of the theater. This does not change the character of the transaction. If petitioner was satisfied to look to the profits of the theater for repayment of the amount advanced, that does not make the advancement any less a loan. The only effect of this is to change the character of the security upon which the petitioner relied for repayment.
As an alternative, petitioner says that he acquired an asset for the $150,000 and that that amount should be depreciated over the life of-the asset. We do not understand what the asset is that petitioner claims to have acquired. It was not the lease, for that had been assigned to the George M. Cohan Grand Opera House Co., a corporation. All that he acquired, under the contract of October 20, 1922, was Harris’ stock in the corporation, which of course is not depreciable. It is said that Harris gave up his rights to any profits. That is true, but it is only an incident to the sale of the stock and clearly it is nothing that is depreciable.
Under issue 9 deductions are claimed 'for so-called luxury taxes on jewelry purchased from Tiffany & Co. The taxes here involved are imposed by section 905 of the Revenue Acts of 1918 and 1921. That section is the same under both Acts, except for the effective date, the pertinent parts reading as follows:
That * * * there shall be levied, assessed, collected, and paid * * * upon all articles commonly or commercially known as jewelry, * * * pearls, * '* * when sold by or for a dealer or his estate for consumption or use, a tax equivalent to 5 per Centum of the price for which so sold.
Every person selling- any of the articles enumerated in this section shall make returns under oath * * * and pay the taxes imposed in respect to such articles by this section * * *.
*761 It is apparent from this quotation that the taxes are imposed on sales by the dealer and are payable by him, and are not imposed on the purchaser. See Colgate & Co. v. United States (Ct. Cls.), decided February 20, 1928. Such being the case, the petitioner is not entitled to any deduction for any amount which he may have paid the jeweler as a reimbursement for excise taxes. If he paid the jeweler any amount on account of excise taxes (and it is not shown that he did) such payment was a reimbursement to the dealer and not a payment of taxes; it was a demand of the jeweler, not of the sovereign.
■ The next issue is based on the claims of petitioner for deductions for advertising, entertainment and traveling expenses. We can not doubt, upon the record, that petitioner was required to and did spend large sums of money in traveling and entertaining during the period January 1, 1921, to June 30, 1923. There are, however, two obstacles to the allowance of the claims which the record has failed to overcome. One is that the amounts claimed are bare estimates unsupported by any vouchers or bookkeeping entries of any kind. The other is that we do not know what part of the amounts expended were for personal expenses. In these circumstances we can not say that the respondent erred in disallowing the deductions claimed.
While we do not have before us the actual computation of the respondent in determining the tax for the six months’ period January 1 to June 30, 1921, it appears from the pleadings and the briefs that the computation was made in accordance with section 226 (c) of the Revenue Act of 1921.
The petitioner objects to having section 226 (c) applied to such part of his income as consisted of items which fell in or occurred once during any particular year. Section 226 as a whole is certainly applicable to the instant case, providing as it does for cases of change from calendar to fiscal year basis. Subdivision (c) which lays down the rule to be followed in making the computation in such cases makes no distinction between income received on the first or last day of the period, or income consisting of a lump sum or received at intervals throughout the period. The language of section 226 (c) is that “the net income shall be placed on an annual basis,” and it makes no distinction between different kinds of net income or different dates of receipt. As we see it, the section applies to all net income of the period and we fail to see wherein the respondent erred in his application.
The affirmative issue raised by the respondent is that in computing the deficiency for the fiscal year ended June 30, 1923, he erred in allowing as a credit against' the tax liability that he determined an amount of $15,407.39 under the erroneous assumption that a *762 return had been filed for the calendar year 1923 showing that amount of tax.
The amount here involved, $15,407.39, was shown as the tax on the petitioner’s return for the calendar year 1922, was assessed, and allowed as a credit by the respondent in determining the tax liability for the fiscal year ended June 30, 1922, as shown by the computation attached to the deficiency notice. No return was filed by the petitioner for the calendar year 1923. It is evident from this that the respondent did err in crediting against the tax for the fiscal year ended June 30, 1923, the tax reported for the calendar year 1922 and credited in making the computation for the fiscal year ended June 30, 1922.

Judgment will be entered on 15 days’ notice, under Rule 50.